UNITED STATES COURT OF APPEALS

FOR THE EIGHTH CIRCUIT

_____

No. 95-1574

_____

David Habiger,                      *
                                    *
     Plaintiff - Appellant    *
                                    *  Appeal from the United States
     v.                             *  District Court for North Dakota.
                                    *
City of Fargo; Ann Alzheimer,   *
in her official capacity and    *
as an individual; Mike Kjera,   *
in his official capacity and    *
as an individual; Scott         *
Stenerson, in his official      *
capacity and as an individual;  *
Don Lawyer, in his official     *
capacity and as an individual;  *
Mark Lykken, in his official    *
capacity and as an individual,  *
                                    *
     Defendants - Appellees.      *

_____

Submitted: October 18, 1995

Filed: April 4, 1996

_____

Before WHITE,[*] Associate Justice (Ret.), McMILLIAN and LOKEN, Circuit
Judges.

_____

WHITE, Associate Justice (Ret.).

_____

[*]The Honorable Byron R. White, Associate Justice of the
United    States Supreme Court, (Ret.), sitting by
          designation, pursuant to 28 U.S.C. § 294(a).

## I. INTRODUCTION

Plaintiff-Appellant David A. Habiger ("Habiger") appeals from the district court's entry of partial summary judgment and a jury verdict against him in his Section 1983 action brought in the wake of his arrest for violating a temporary restraining order ("TRO"). The district court rejected his unlawful arrest claim, ruling for the police officers on qualified immunity grounds and dismissing the claim against the City of Fargo ("the City") based on its alleged failure to train its police officers. *Habiger v. City of Fargo,* No. A3-93-81 (D.N.D. filed Jan. 23, 1995). A jury then found that neither the City nor its officers were liable for using excessive force in arresting Habiger. Habiger now appeals, complaining that the district court erred in (1) granting summary judgment to the officers on qualified immunity grounds; (2) dismissing the illegal arrest/failure to train claim against the City; and (3) refusing to instruct the jury that it should consider the legality of the arrest in determining whether the officers' use of force in arresting Habiger was objectively reasonable. For the reasons stated below, we reject each of these claims of error, and AFFIRM the judgment of the district court.

## II. BACKGROUND

### A.

On October 28, 1991, a North Dakota state trial court issued a TRO restricting the protesting activity of pro-life demonstrators in the immediate vicinity of the Fargo Women's Health Organization, Inc. ("FWHO" or "the clinic"). *Fargo Women's Health Organization, Inc. v. Lambs of Christ,* No. 91-1953 (Cass County Dist. Ct. filed Oct. 28, 1991). The operative provisions of the TRO enjoined the pro-life protestors from:

(a). trespassing on, sitting in, blocking, impeding or obstructing ingress or egress from FWHO facilities and the homes and residences of Plaintiffs Miks, Wicklund, and Bovard, as well as the homes and residences of any staff (paid or volunteer) or patients of FWHO.

(b). harassing, intimidating or physically abusing persons entering, leaving or working at FWHO facilities;

(c). obstructing the work of the persons located at FWHO facilities by any means -- including singing, chanting, yelling, shouting, or screaming -- that substantially interferes with the provision of medical services including counseling, with[in] such facility;

(d). going within 100 feet of the property line of FWHO during such times as they are open for business, except that one person may quietly and peacefully picket such facility, so long as that person does not interfere with the operations of said facility as provided herein.

(e). following, harassing, photographing, videotaping, and intimidating, or speaking to staff and patients of FWHO who have indicated that they do not wish to be spoken to.

(f). distributing leaflets or brochures to any person who has indicated orally or by gesture that such person does not wish to receive such literature.

(g). inducing, encouraging, or directing others to take any of the actions described in paragraphs (a). - (f). above.

. . .

IT IS FURTHER ORDERED THAT THE Cass County Sheriff, Fargo Police Department, and any other Law Enforcement Authority may enforce this order and may make arrests for the violation of this order.

*Id*. at 2-4.

The pro-life protestors challenged the constitutionality of the TRO, but the North Dakota Supreme Court, ten months after the arrest challenged in this case, upheld those provisions of the TRO that are directly involved in this case. *See Fargo Women's Health Organization, Inc. v. Lambs of Christ,* 488 N.W.2d 401 (N.D. 1992).[1] Specifically,

---

[1]More precisely, the North Dakota Supreme Court reviewed the preliminary injunction that superseded the TRO and that contained the identical provisions. *See Fargo Women's Health Org.*, 488 N.W. 2d at 405. For the sake of convenience, we shall refer to the injunction as a TRO.

the court upheld the excessive noise restriction contained in paragraph (c), *supra*, which is involved here, on the ground that the noise created by the protestors had been so loud and invasive as to substantially interfere with the provision of medical services. *Id*. at 409-10. On this appeal, Habiger does not challenge this judgment and does not contest the facial validity of paragraph (c) or any other provision of the TRO.[2]

In its opinion, the North Dakota Supreme Court described the events leading up to the issuance of the TRO:

> Since 1981, the Fargo Women's Health Organization has operated a clinic which provides a full range of gynecological medical services including first trimester abortions. Approximately 75 demonstrations by anti-abortion protestors have been held in the vicinity of the clinic. It appears that most of these demonstrations were peaceful, consisting of picketing, leafleting, and speaking to people in the area near the clinic. Beginning March 29, 1991, the character of the protests changed. On that day, 26 people stormed the clinic, broke down a door, occupied its rooms, and locked themselves together using bicycle locks. The demonstrators refused to leave, were arrested, and were removed by Fargo police after their locks were removed by a locksmith.

> On nine other occasions in the ensuing seven months, demonstrators were arrested for criminal acts committed in conjunction with anti-abortion protests. As a result of these actions, patients were confronted and jostled as they attempted to walk to the clinic. Some patients were able to reach the clinic only with the assistance of

---

[2]As for the other provisions of the TRO, the North Dakota Supreme Court upheld paragraph (b), as well as paragraph (e) as construed, except for its "speaking" prohibition, which was stricken. *Fargo Women's Health Org.,* 488 N.W.2d at 410-11. The court also determined that the 100-foot place restriction in paragraph (d) was content neutral and served a "significant governmental interest." *Id*. at 407-09. However, the court concluded that paragraph (d) was not narrowly tailored as required by the First Amendment, and thus, remanded that provision for sufficient narrowing. *Id*. at 409. In any event, the area restriction is not involved in this appeal. Finally, the court invalidated paragraph (f) in its entirety. *Id*. at 411. Paragraphs (a) and (g) were apparently not challenged.

-4-

volunteer "escorts" or professional security officers who walked them through groups of hostile, screaming protestors that surrounded them, stood in their way, forced leaflets into patients' hands and otherwise impeded patients' access to the clinic. Protestors struck, pushed, and threatened escorts and guards with physical harm. One protestor was arrested trying to climb the clinic's fence in order to reach a patient using the clinic's rear entrance.

Patients who attempted to drive to the clinic were confronted at the entrance to the clinic parking lot. Protestors stood in the way of the cars, climbed onto the vehicles' hoods or under the cars. Some protestors attempted to fasten themselves to the frames of cars in order to delay their removal from the site. On one occasion, protestors placed blocks against the tires and attempted to cut a cable in order to disable a car after they succeeded in stopping it in the clinic's driveway. On another occasion, protestors waited across the street from the clinic for a car to approach the parking lot at which point they rushed into the street, stopped the car, and blocked the public road. As a result of these tactics, the clinic was effectively blockaded; patients and staff could not enter or leave the clinic for hours at a time.

The protestors called these blockades "rescues." At anti-abortion rallies held after the "rescues" began, spokesmen for the associations asked volunteers to participate by being jailed for rescuing babies. The rescues were to be part of a two-year campaign to force the clinic to close.

Away from the clinic, protestors followed clinic staff members in cars, and into grocery stores, airports, and other public buildings. Their activities were particularly intense against one of the clinic's doctors. During a five month period, groups as large as 30 demonstrated at the gate of her home, congregating in predawn hours, shouting and honking car horns, and attempting to block the departure of the doctor and her family members. Some protestors roamed on the doctor's property, leaving a banner draped over a car, a baby stroller and basket on her porch. During times when the protestors were near the site, the doctor's house and garage were vandalized. Protestors followed the doctor in cars as she drove to Fargo or to the airport. Groups waited for the doctor in airport parking ramps and rushed at her, yelling and flashing cameras. They leafleted cars at the school of the doctor's daughter, and two protestors were asked to leave the school building when they attempted to obtain a photo of her daughter. A car full of protestors also followed the daughter of one of the clinic's volunteers.

*Id*. at 404-05.

**B.**

On the morning of October 31, 1991, Habiger and approximately seventy-five other individuals participated in a protest near the clinic to protest the issuance of the TRO.  During the protest, several police officers, including Sergeant Don Lawyer ("Lawyer") were in front of the clinic to enforce the TRO.  After Habiger walked over to Lawyer, Lawyer told him that he could not cross the red-line marking the 100 foot radius around the clinic.  Habiger responded that, "this is quite a country we got here.  We're living on the edge of socialism.  It's more like a communist regime." *Habiger,* slip op. at 5.

After several of the protestors refused to stand behind the line, approached within 80 feet of the clinic property, sat down, and refused to move, the police officers began arresting them for violating the terms of the TRO.  About the time that the officers began arresting the protestors, Habiger, from behind the line, began to criticize loudly the officers' conduct.  Lawyer repeatedly asked Habiger to quiet down.  Despite Lawyer's requests, Habiger continued to condemn the police officers in loud tones:

> This is a dictatorship in this town.  An evil city.  You work for evil people that are killing human beings in there.  You don't care.  If you had any guts, you'd get out of that uniform and take a stand for life.  What's that job mean to you? It ain't gonna mean nothing when your life is over.  Take a stand for Jesus Christ.  They're killin' human beings in there and nobody cares.  And you stand there with that smirk on your face.  When you stand before God, you're going to answer for it.

*Id*. at 6.  Lawyer again asked him to quiet down.  This provoked an even more emphatic response from Habiger:

> I can talk all I want.  It's a free country.  I'm behind the line.  If you guys had any guts, you'd take them

uniforms off and we'd all storm that place and close it down. They're killing children in there. Yet nobody does nothin'. Everybody stands back. They're killing children. This town's a dictatorship. Its a communistic-it's communistic. You're evil. You're all evil. They're standing up for murderers. They're killing children that have a right to live. We had, we got a right to our lives. I don't care.

*Id*. at 6-7. Finally, Lawyer told Habiger that he was under arrest. Habiger asked "For what?, " and Lawyer responded, "Court order." Habiger then stated, "For what? I'm just talking." Lawyer replied, "You're yelling too loud." *Id*. at 7. Habiger resisted the arrest, and several other officers (Lawyer's co-defendants in this action) came to assist Lawyer in restraining Habiger.

After the police brought Habiger to the ground and completed the arrest, he complained of pain in his arm, and the police called an ambulance to assist him. After he was treated at a local hospital, police officers brought Habiger to jail. The following day, Habiger was charged with disorderly conduct and preventing arrest. Habiger posted the necessary bond, but as a condition of his release, he was ordered to stay away from the clinic. On or about March 25, 1992, the Cass County State Attorney's Office dismissed the charges on First Amendment and insufficiency of the evidence grounds.

On May 7, 1993, Habiger filed this 42 U.S.C. § 1983 action, claiming that several of the City's police officers and the City violated his First and Fourth Amendment rights. As to the officers, Habiger alleged that they arrested him for violating the noise restriction contained in paragraph (c) of the TRO without probable cause and that they used excessive force in arresting him. As to the City, Habiger charged that its failure to train the defendant officers led to his unconstitutional arrest. Habiger's complaint also alleged state law claims of false arrest, false imprisonment

and assault and battery.  Magistrate Judge Klein,[3] on summary judgment, concluded that the officers were protected by qualified immunity on the probable cause and First Amendment issues and dismissed the claim against the City for its alleged failure to train the officers.  Similarly, Judge Klein ruled that the state law claims of false arrest and false imprisonment were barred under North Dakota's immunity doctrine.

The court, however, denied the summary judgment motion on Habiger's excessive force and state law assault and battery claims, ruling that these claims should be tried to a jury, which then occurred.  The jury found for the officers and the City.  Habiger then filed this appeal.  He argues that the district court erred in (1) granting summary judgment to the officers on the unconstitutional arrest claims; (2) granting summary judgment to the City on the alleged failure to train its officers; and (3) not instructing the jury to consider the lawfulness of the arrest in determining whether the officers, use of force was objectively reasonable.  We exercise jurisdiction under 28 U.S.C. § 1291, and we now AFFIRM.

### III.  DISCUSSION

We begin by setting out the legal propositions that are not in dispute.  First, to withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated plaintiff's clearly established right.  *Foulks v. Cole County, Mo.,* 991 F.2d 454, 456 (8th Cir. 1993).  Second, Habiger had a clearly established right under the Fourth Amendment not to be arrested unless there was probable cause for his arrest.

---

[3]This case was tried to a magistrate judge by consent of the parties.

Third, Habiger also had a clearly established right to express his views about abortion in a public forum; but this right is not absolute since it is subject to proper time, place and manner regulations, such as the excessive noise prohibition contained in paragraph (c) of the TRO. Fourth, the validity of the TRO, of which Habiger had notice, is not in dispute; hence, if the police officers had probable cause to believe that Habiger was violating the TRO by yelling or screaming so as to substantially interfere with the provision of medical services (e.g., counseling), his arrest was valid and would not violate either the Fourth or the First Amendment. Fifth, "[t]he issue for immunity purposes is not probable cause in fact but arguable probable cause," *Myers v. Morris,* 810 F.2d 1437, 1455 (8th Cir.), *cert. denied,* 484 U.S. 828 (1987), that is, whether the officer should have known that the arrest violated plaintiff's clearly established right, *Foulks v. Cole County, Mo.,* 991 F.2d at 456. Sixth, in granting summary judgment in favor of defendant officers on immunity grounds, the court did not need to rule on whether there was actual probable cause to arrest Habiger. Seventh, although the City may not be held liable for the mistakes of its officers on a respondeat superior basis, it is not entitled to the shield of qualified immunity afforded to its officers. *See Owen v. City of Independence,* 445 U.S. 622, 657 (1980). Thus, if there was not actual probable cause to arrest Habiger, the City could be held liable on a failure to train theory unless its failure to train its officer did not lead to Habiger's unlawful arrest, which the district court held was the case and which is an issue in this appeal.

## A. THE QUALIFIED IMMUNITY ISSUE

We review the district court's grant of summary judgment de novo. *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307, 1310 (8th Cir. 1993). We address first whether a reasonably competent officer could believe there was probable cause to arrest Habiger. As the district court recounted, when officer Lawyer arrested Habiger, he stated that Habiger was violating the court order by "yelling too loud." Thus, Lawyer

must have thought that Habiger's repeated yelling substantially interfered with the clinic's operation and violated the noise restriction contained in paragraph (c) of the TRO. The court posed the issue as whether " a reasonable police officer could have believed that Habiger's yelling was substantially interfering with the operation of the clinic." *Habiger,* slip op. at 21. The court concluded that "[a] reasonable police officer fearing a magnification of the volatile situation could have believed that Habiger's speech, delivered while many of his fellow demonstrators were being arrested for violating the court order, substantially interfered with clinic operations." *Id*. at 22. Thus, the court ruled that the officers were immune from suit.

We agree with the district court. Habiger was screaming at the top of his voice from a point some thirty-three yards from the clinic property. Whether Habiger could be heard inside the clinic or by patients seeking to enter the clinic was a judgment call on Lawyer's part, the kind of a decision that police officers must repeatedly make. The qualified immunity doctrine allows officers to make reasonable errors so that they do not always "err on the side of caution." *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (per curiam) (internal quotation omitted).[4] Furthermore, the "substantial interference" standard had yet to be interpreted, and an officer on duty in the field is entitled to make a reasonable interpretation

---

[4]We have previously explained that:

> Law enforcement officers should not, on pain of having to pay damages out of their own pockets, be required to anticipate how appellate judges will apply maxims of constitutional adjudication about which even those judges sometimes disagree [-] it would be unworkable for the officers to await interpretations from federal appellate judges rendered long after the orders were executed to learn whether they will be civilly liable for performing an assigned duty.

*McCurry v. Tesch,* 824 F.2d 638, 642 (8th Cir. 1987) (internal quotation omitted).

of the law he is obligated to enforce. *See Gorra v. Hanson,* 880 F. 2d 95, 97-98 (8th Cir. 1989). Thus, given Habiger's loud and repeated yelling, we conclude that the district court correctly held that the officers arguably had probable cause for Habiger's arrest and were immune from suit. In doing so, we reject three First Amendment arguments that Habiger claims foreclose or fatally infect the district court's judgment.

First, Habiger contends that the district court failed to consider the import of paragraph (i) of the TRO, which cautions that nothing in the TRO should be construed to abridge the lawful exercise of one's First Amendment rights. But Habiger does not challenge the constitutionality of the noise restriction. An arrest for violating that provision is not barred by the First Amendment, nor does an officer's reasonable mistake about the legality of the arrest disentitle the officer to qualified immunity.

Second, Habiger asserts that the arrest was pretextual; that is, he argues that the officers arrested him not to enforce the TRO, but because of their disagreement with his views on abortion. This matter of intent, it is submitted, should not have been disposed of on summary judgment. On the facts of this case, however, we seriously doubt that this claim of pretext, even if proved, would nullify the finding of probable cause to believe that Habiger was violating the TRO; nor would it disentitle the officers to qualified immunity. *See U.S. v. Bloomfield,* 40 F.3d 910, 915 (8th Cir. 1994) (en banc), *cert. denied.,* 115 S. Ct. 1970 (1995) ; *Foster v. Metropolitan Airports Comm 'n.* , 914 F. 2d 1076, 1081 (8th Cir. 1990). In any event, we need not consider this issue since Habiger has plainly failed to support his claim of pretext by demonstrating a genuine issue of material fact on this question.

Third, Habiger points to the district court's conclusion that "a reasonable police officer fearing a magnification of the volatile situation could have believed that Habiger's speech, delivered while

many of his fellow demonstrators were being arrested for violating the Order, substantially interfered with clinic operations." He asserts that this conclusion disregards the First Amendment by considering the emotive effect his speech might have on his fellow demonstrators. In similar vein, Habiger points to what Officer Lawyer said in his affidavit: Habiger was "very emotional and disruptive" and "made it much more difficult to control the crowd." App. 105-106, 110. Habiger supports his legal argument by quoting from *Texas v. Johnson,* 491 U.S. 397, 409 (1989).

> we have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the actual circumstances surrounding such expression, asking whether the expression "is directed to inciting, or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969).

See Reply Br. at 5.

We do not belittle this basic constitutional principle. As we see it, this principle was not violated either by the officers' conduct or by the district court's opinion and judgment. The circumstances faced by the officers and leading to Habiger's arrest are adequately clear. Habiger was one of 75 or so protestors gathered in front of the clinic. Some of the demonstrators crossed the red line to within 80 feet of the clinic, sat down and refused to move, asserting that they had a constitutional right to be where they were. At this point, Habiger, from behind the line but in the midst of the protestors, began screaming invectives at the police at the top of his voice. He refused to quiet down. In these circumstances, Lawyer and his fellow officers could reasonably believe that Habiger's extremely loud and emotional shouting was directed at inciting imminent conduct expressly barred by the TRO and that his shouting was substantially interfering with the business of the clinic. The officers surely thought that they had probable cause to arrest Habiger. Even if this

was a mistake, the purpose of the qualified immunity doctrine is to provide ample room for mistaken judgments and to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). In our view, the officers' judgment was not "plainly incompetent," and the district court did not err in referring to the probable impact of Habiger's screaming on the other demonstrators and in concluding that there was arguable probable cause to believe that Habiger was substantially interfering with the business of the clinic.

### B.  MUNICIPAL LIABILITY

Habiger also argues that, if the officers arrested Habiger without actual probable cause (even if there was arguable probable cause so as to clothe them with qualified immunity), the City is liable for the illegal arrest on a failure to train theory.  *See Medina v. City of Denver,* 960 F.2d 1493, 1499-1500 (10th Cir. 1992) (noting that there is no inconsistency between granting qualified immunity to City officials and holding the City liable).  First, Habiger claims that the district court never addressed the question of actual probable cause because it did not analyze the underlying constitutional violation (which it assumed) , but merely focused on the presence of arguable probable cause.[5]  *See* Discussion of Jury Instructions, App. at 172 ("I don't want to create the impression that the Court has ruled that the arrest was valid because I've not ruled either way.").[6]

---

[5]The essence of Habiger's argument that the district court ruled on immunity grounds and did not hold that the officers had actual probable cause to arrest Habiger-is that "[i]f probable cause was indeed present, it is not necessary to consider an immunity defense." *Foster v. Metropolitan Airports Comm'n,* 914 F. 2d 1076, 1079 (8th Cir. 1990).

[6]While this discussion of the jury instructions represents Judge Klein's interpretation of her own order, the order itself also appears to conclude that the police officers had arguable, not actual, probable cause to make the arrest. *See, e.g.* , slip op at 22 ("whether Habiger's passionate speech substantially interfered with clinic operations is subject to debate")*; id*. at 23 ("[A] reasonable police officer could have believed that Habiger's arrest was lawful.").

In effect, Habiger continues, the district court wrongly applied the shield of qualified immunity to the City. *See Owen,* 445 U.S. at 657.

This argument, even if sound, does not require us to reverse the district court, for it also rejected Habiger's failure to train theory on the ground that "[a] dditional specialized training on First Amendment protections would not have influenced a reasonable police officer's decision to arrest plaintiff for violating the [TRO]." *Habiger* slip op. at 39-40; *id*. at 39 ("inadequate training was not the proximate cause of plaintiff's alleged constitutional injury."). Moreover, with specific reference to the TRO, the district court explained that, since the TRO only went into effect three days before Habiger's arrest, the Department did not have time to train its officers how to handle these specific protests. *Id*. at 40. Thus, because Habiger has failed to demonstrate how the City's failure to train its officer caused the violation of his constitutional rights, we affirm the district court's judgment that the City cannot be held liable on a failure to train theory.

### C. JURY INSTRUCTIONS ON EXCESSIVE FORCE

Finally, Habiger argues that the district court erred by instructing the jury that the objective reasonableness of the force used in arresting him did not turn, at least in part, on whether the arrest was legal.[7] In support of this contention, Habiger suggests

---

[7]Specifically, Habiger challenges Jury Instruction No. 8. That instruction provided:

> You will not be asked to decide whether plaintiff's arrest was valid or not, or whether he was legitimately exercising his right to free speech at the time of his arrest. The court has already resolved these issues and you should not consider them.

App. at 199.

that *Graham v. Connors* focus on "the severity of the crime" as a factor justifying the use of force suggests that the legality of the arrest can make the use of force unreasonable. 490 U.S. 386, 396 (1989). We reject this argument because the "severity of the crime" does not necessarily encompass whether there was actual probable cause to arrest the defendant for that alleged crime. The touchstone of *Graham* is objective reasonableness, and the force used to effect a good faith, though false, arrest is not necessarily more likely to be unreasonable than a good faith, though legal, arrest.[8] The jury instructions reflected this essence of *Graham* and the jury correctly focused on the severity of alleged crime and the other factors outlined in *Graham.* Therefore, we affirm the jury instructions on the excessive force count.

### IV. CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

---

[8]Indeed, we are inclined to believe that the presence of actual or arguable probable cause is irrelevant to the objective reasonableness of the force used to effect an arrest. That is, if the identical force is used to arrest two defendants suspected of committing the identical crime, the objective reasonableness of the use of force does not depend on whether the arrest was based on actual or arguable probable cause.