# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2134

_____

Eugene Frye, Lowell Hale,                    *
                                             *
    Plaintiffs-Appellants,           *
                                             *
Anthony Leake,                               *
                                             *
    Plaintiff,                       *
                                             *
Gary Rickman, Richard Schilling,             *
                                             *
    Plaintiffs-Appellants,           *
                                             *
Carl Lackey,                                 *
                                             *
    Plaintiff,                       *
                                             *
Elizabeth Schilling; Deborah Schilling,      *   Appeal from the United States
                                             *   District Court for the
    Plaintiffs-Appellants,           *   Western District of Missouri
                                             *
Noah Leake,                                  *
                                             *
    Plaintiff,                       *
                                             *
Darla Hale, Kathryn Coons,                   *
                                             *
    Plaintiffs-Appellants,           *
                                             *
    v.                               *
                                             *
Kansas City Missouri Police                  *

Department, Board of Police         *
Commissioners, Tommy Woods,        *
Police Officer, sued in his individual and*
official capacities, Christina Ludwig,     *
John Does, Police Officers #1-20, sued   *
in their individual and official capacities,*
Dennis Eckhold; Kay Barnes; Karl       *
Zobrist; Brian Young, as members of     *
the Kansas City Board of Police         *
Commissioners, in their individual      *
and official capacities, Dale Close,      *
Legal Advisor to the Kansas City Board *
of Police Commissioners, in his         *
individual and official capacity,        *
Police Officer Tarwater, in his         *
individual and official capacities,      *
                                           *

      Defendants-Appellees.         *

_____

Submitted: November 17, 2003
Filed: July 26, 2004

_____

Before LOKEN, Chief Judge, and McMILLIAN and BEAM, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Appellants Eugene Frye, Lowell Hale, Gary Rickman, Richard Schilling, Elizabeth Schilling, Deborah Schilling, Darla Hale, and Kathryn Coons appeal from a judgment entered in the District Court[1] for the Western District of Missouri granting motions for summary judgment filed by Kansas City, Missouri, police officers. Frye

_____

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

v. Police Dep't, 260 F. Supp. 2d 796 (W.D. Mo. 2003) (Frye). Appellants argue that the district court erred in holding that the officers were entitled to qualified immunity. We affirm.

**BACKGROUND**

On Saturday, June 23, 2001, at approximately 11:00 a.m., appellants and several other individuals assembled at the intersection of two heavily trafficked roads in Kansas City, Missouri, to protest and provide information about abortion. There was a grocery store on one corner, shopping centers on or near two corners, and a strip mall on the fourth corner. The demonstrators placed themselves between the sidewalk and the curb, a distance of about two or three feet from the street. Some of the demonstrators held small signs. Others placed large, poster-sized signs of approximately three-by-five-feet on the ground. Some of the larger signs displayed color photographs of aborted fetuses. For example, appellant Lowell Hale placed a large sign displaying a photograph of the head of a decapitated fetus on one side and a photograph of the parts of a dismembered fetus on the other side "right along the curb."

In response to complaints about "offensive signs," police officers Christina Ludwig and Tommy Woods were dispatched to the intersection. After telling the demonstrators that they could continue to demonstrate as long as they did not create a traffic hazard, the officers left the scene. A few minutes later, the officers returned to speak to a group of motorists who had stopped to complain about the photographs of mutilated fetuses along the side of the road. Captain Rex Tarwater and Sergeant William Wranich also were dispatched to the scene. Wranich observed that traffic was heavy and was being affected by the demonstration. In his deposition, Wranich stated: "Drivers who were looking at the signs were nearly running into the backs of other vehicles." One of the motorists told the officers that she was so shocked by the photographs that she slammed on her brakes and had to pull over into a parking lot

in order to recover. Two motorists complained that they had young children in their vehicles and were upset that the children could easily see the photographs. All of the motorists complained that viewing the graphic photographs had impaired their ability to "safely and properly control their vehicles."

Tarwater told the demonstrators that the "poster-size photos were offending people passing through the intersection [and thus] creating a hazard to public safety." He then asked the demonstrators to move further away from the road with the large photographs of the mutilated fetuses. They refused, and Tarwater gave them the option of staying at the same location as long as they did not display the large photographs that were creating a traffic hazard. They again refused. Tarwater, who had sought advice from the city's attorney, told them if they refused to either relocate or stop displaying the large photographs of mutilated fetuses at the side of the road, they would be arrested. They again refused and five appellants were arrested for violating the city's loitering ordinance, which, in relevant part, makes it "unlawful for any person to . . . stand . . . either alone or in concert with others in a public place in such a manner so as to [o]bstruct any public street, public highway . . . by hindering or impeding the free and uninterrupted passage of vehicles, traffic, or pedestrians." Kansas City, Mo., Ordinances, § 50-161(a).

In March 2002, eleven of the demonstrators filed the present civil rights action in federal district court, alleging that the police officers had violated their federal constitutional rights of free speech and assembly, equal protection, and freedom from false arrest. They also alleged state law tort claims. The police officers filed motions for summary judgment on qualified immunity grounds.

The district court granted the police officers' motions. The district court held that the police officers had reasonably interpreted the ordinance as prohibiting conduct that distracted motorists and thereby obstructed a public street by impeding the safe flow of traffic. Noting that the First Amendment does not entitle citizens to

create safety hazards, the district court held that the police officers had imposed reasonable restrictions not because of the content of appellants' anti-abortion message, but "because of the deleterious effects of the manner in which they chose to express their message." Frye, 260 F. Supp. 2d. at 799. The district court emphasized that the officers had not forbidden the demonstrators to display any of the large photographs of mutilated fetuses, but only restricted the place where they could be shown in order to avoid a traffic hazard. Id. at 800. The district court declined to exercise supplemental jurisdiction over the state law tort claims and dismissed those claims without prejudice. This appeal followed.

**DISCUSSION**

We review the district court's grant of grant of summary judgment de novo. Summary judgment is appropriate, if, after viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

In a qualified immunity appeal, our first inquiry is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). If so, the next inquiry "is to ask whether the right was clearly established." Id. "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. In determining whether a right is clearly established, we ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. It is also important to note that "an officer on duty in the field is entitled to make a reasonable interpretation of the law he is obligated to enforce." Habiger v. City of Fargo, 80 F.3d 289, 296 (8th Cir.) (Habiger), cert. denied, 519 U.S. 1011 (1996)). We apply these principles because "the purpose of the qualified immunity doctrine is to provide ample room for

mistaken judgments and to protect 'all but the plainly incompetent or those who knowingly violate the law.'" Id. at 297 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

As to the first inquiry, there is no dispute that appellants had a First Amendment right to express their views about abortion in a public forum. As to the second inquiry, appellants argue that the district court misapplied First Amendment law to the facts of the case, as taken in the light most favorable to them as the nonmoving parties. They concede that officers:

> may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (Ward) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

However, appellants argue that, here, the police officers' restrictions were content-based, not content-neutral. In particular, appellants argue that the district court ratified the police officers' improper use of a "heckler's veto," reasoning that the police officers imposed the restrictions based on the motorists' adverse reactions to the large photographs of mutilated fetuses by the side of the road. It is true that "[t]he right to free speech, of course, includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience." Hill v. Colorado, 530 U.S. 703, 716 (2000) (Hill). However, "'[i]t may not be the content of the speech, as much as the deliberate verbal or visual assault that justifies proscription.'" Id. (quoting Erznoznik v. Jacksonville, 422 U.S. 205, 210-11 n.6 (1975)).

-6-

Thus, we must determine whether the police officers' conduct in placing restrictions on the display of the large signs displaying photographs of mutilated fetuses was based on the content of appellants' anti-abortion message, or on a content-neutral factor. "'The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'" Id. at 719 (quoting Ward, 491 U.S. at 791). In other words, "[t]he government's purpose is the controlling consideration." Ward, 491 U.S. at 791. In addition, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages, but not others." Id.

In this case, taking the facts in the light most favorable to appellants, we agree with the district court that the police officers did not impose restrictions based on the content of appellants' message. As the district court noted, the police officers did not forbid appellants from expressing their anti-abortion message. Indeed, the police officers did not forbid appellants from expressing their message by the use of the large photographs displaying mutilated fetuses. Rather, the police officers placed reasonable restrictions on the location of the signs in order to protect public safety. The officers gave the demonstrators the option of staying by the side of the road if they did not display the large, graphic photographs that had distracted motorists or the option of displaying the photographs at a location further from the road. Thus, the police officers narrowly tailored the restrictions to serve a significant governmental interest and left open alternative channels of communicating their message.

Although appellants argue that they had a right to display the large, graphic photographs at the side of the road, the Supreme Court "has regularly rejected the assertion that people who wish to 'propagandize protests or views have a

-7-

constitutional right to do so whenever and however and wherever they please.'" United States v. Grace, 461 U.S. 171, 177-78 (1983) (quoting Adderley v. Florida, 385 U.S. 39, 47-48 (1966)). In this case, the police officers' conduct did "not provide for a 'heckler's veto' but rather allow[ed] every speaker to engage freely in any expressive activity communicating all messages and viewpoints subject only to" reasonable place and manner restrictions. Hill, 530 U.S. at 734.

Nor, contrary to appellants' argument, did the district court impermissibly look to their "signs to determine which signs could be removed by [the] police officers (based on the reaction the signs generated), and which could remain." Br. for Appellants at 20. In Hill, the Supreme Court rejected a similar argument. In that case, abortion protestors argued that a state statute was necessarily content-based because it was necessary to examine the content of a protestor's statement to determine whether it violated the statute. The Supreme Court disagreed, explaining that "[i]it is common in the law to examine the content of a communication to determine the speaker's purpose" and that it had "never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether the rule of law applies to a course of conduct." Hill, 530 U.S. at 721; see also Veneklase v. City of Fargo, 248 F.3d 738, 745 (8th Cir.) ("We reject the argument that because an inquiry might be necessary to determine whether a person is picketing, the ordinance therefore is content-based."), cert. denied, 534 U.S. 815 (2001).

As to the sufficiency of the governmental interest, appellants do not dispute, nor could they, that "[i]t is a traditional exercise of the State's 'police powers to protect the health and safety of their citizens.'" Hill, 530 U.S. at 715 (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 475 (1996)). They also concede that "the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that an unwilling audience cannot avoid it." Id. at 716. However, they argue that "the fact that [their] allegedly offensive speech may have affected the

-8-

driving skills of motorists is simply irrelevant," relying on Cohen v. California, 403 U.S. 15 (1971) (Cohen).  Br. for Appellants at 25.

Appellants' reliance on Cohen is misplaced.  In that case, the Supreme Court tolerated a protestor's right to wear a jacket expressing his views in vulgar language in the corridors of a courthouse because viewers could "effectively avoid further bombardment of their sensibilities simply by averting their eyes."  403 U.S. at 21.  However, "[t]he recognizable privacy interest in avoiding unwanted communication varies widely in different settings."  Hill, 530 U.S. at 716.  It is undisputed that the anti-abortion demonstration took place at a heavily traveled intersection during a busy part of the day.  The police officers observed that the presence of the large signs depicting photographs of mutilated fetuses near the road side was creating a traffic hazard.  The motorists all complained that viewing the photographs impaired their ability to safely drive their vehicles.  The fact that an accident had not occurred is irrelevant.  The police officers were entitled to decide that the situation presented a danger before an accident occurred.  See ACORN v. St. Louis County, 930 F.2d 591, 596 (8th Cir. 1991) ("The government need not wait for accidents to justify safety regulations.").[2]

In a case similar to the instant case, the Ninth Circuit rejected abortion protestors' argument that they had the right "not only to advocate their cause but also to select what they believe to be the most effective means for doing so."  Foti v. City of Menlo Park, 146 F.3d 629, 641 (9th Cir. 1998) (internal quotation omitted).  In that case, as in this case, the protestors wanted to display three-by-five-foot posters of

---

[2]Although not directly at issue in this case, we note that several motorists had complained that their minor children had viewed the photographs of mutilated fetuses.  In Olmer v. City of Lincoln, 192 F.3d 1176, 1180 (8th Cir.1999) (internal quotation omitted), an abortion protest case, we stated that "a city's interest in protecting very young children from frightening images is constitutionally important; that is, the interest is significant, compelling, and legitimate."

aborted fetuses, but a city ordinance regulated the size and number of picket signs. The Ninth Circuit noted that although the First Amendment protected their right to advocate their cause, the First Amendment did not give them a "right to dictate the manner in which they convey their message within their chosen avenue." Id. The court held that the restriction on the manner of the protest "was permissible in light of the City's substantial interest in requiring drivers to devote greater attention to driving conditions and the road signs." Id. at 642. The same can be said here, and thus the district court did not err in granting summary judgment on appellants' First Amendment claims.

Regarding appellants' false arrest claim, "the issue for [qualified] immunity purposes is not probable cause in fact but arguable probable cause." Habiger, 80 F.3d at 295 (internal quotation omitted). The district court did not err in holding that the police officers reasonably interpreted the ordinance as prohibiting conduct which distracted drivers and thereby obstructed a public street by "hindering the free and uninterrupted flow of traffic." Kansas City, Mo., Ord., § 50-161(a). As previously noted, "an officer on duty in the field is entitled to make a reasonable interpretation of the law he is obligated to enforce." Habiger, 80 F.3d at 296. Also, we note that before appellants were arrested, Tarwater consulted with the city attorney and followed his advice. Although following an attorney's advice "does not automatically cloak [officers] with qualified immunity," it can "show the reasonableness of the action taken.'" Womack v. City of Bellefontaine Neighbors, 193 F.3d 1028, 1031 (8th Cir. 1999) (quoting E-Z Mart Stores, Inc. v. Kirksey, 885 F.2d 476, 478 (8th Cir. 1998)). Indeed, the Seventh Circuit recently stated that "[c]onsulting a prosecutor may not give an officer absolute immunity from being sued for false arrest, but it goes far to establish qualified immunity." Kijonka v. Seitzinger, 363 F.3d 645, 648 (7th Cir. 2004) (internal citation omitted). In this case, the police officers acted reasonably and "surely thought they had probable cause to arrest [appellants]." Habiger, 80 F.3d at 297. Thus, the district court did not err in granting their motion for summary judgment as to the false arrest claim. Id.

Accordingly, we affirm the judgment of the district court.

BEAM, Circuit Judge, dissenting.

I dissent because the Constitution does not allow a small group of passersby to censor, through their complaints, the content of a peaceful, stationary protest. The First Amendment knows no heckler's veto, <u>Robb v. Hungerbeeler</u>, 370 F.3d 735, 743 (8th Cir. 2004), even in an abortion case.

**I.**

When the government enforces a heckler's veto, it infringes upon the First Amendment's most vital role. The First Amendment guards jealously a citizen's right to express even controversial and shocking messages because speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." <u>Terminiello v. Chicago</u>, 337 U.S. 1, 4 (1949). The government confuses the role of (and violates) the First Amendment when it allows citizens to trigger speech suppression *because* the speech offends them (i.e., when it allows hecklers to veto). <u>Hustler Magazine, Inc. v. Falwell</u>, 485 U.S. 46, 54-55 (1988) (holding that, if a speaker's opinion causes offense, that consequence is a reason for according it constitutional protection); <u>Bachellar v. Maryland</u>, 397 U.S. 564, 567 (1970) ("[I]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.") (quotations omitted); <u>see</u> <u>Erznoznik v. Jacksonville</u>, 422 U.S. 205, 209-210 (1975) (citing <u>Cohen v. California</u>, 403 U.S. 15, 21 (1971)); <u>Spence v. Washington</u>, 418 U.S. 405, 412 (1974) (per curiam); <u>Coates v. Cincinnati</u>, 402 U.S. 611, 614 (1971); <u>Brown v. Louisiana</u>, 383 U.S. 131, 133 n.1 (1966); <u>Cox v. Louisiana</u>, 379 U.S. 536, 550 (1965); <u>Wright v. Georgia</u>, 373 U.S. 284, 292 (1963); <u>Terminiello</u>, 337 U.S. at 5; <u>Robb</u>, 370 F.3d at

-11-

743; Lewis v. Wilson, 253 F.3d 1077, 1081-82 (8th Cir. 2001). Indeed, the protection against hecklers' vetoes even forbids statutory schemes that would allow a disapproving citizen to silence a disagreeable speaker by complaining on other, apparently neutral, grounds. Reno v. ACLU, 521 U.S. 844, 880 (1997) (holding that prohibition on knowingly communicating indecent material to minors in Internet forums was invalid because it conferred "broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17-year-old-child . . . would be present").

The prohibition of hecklers' vetoes is, in essence, the First Amendment protection against the government effectuating a complaining citizen's viewpoint discrimination. The genesis of the viewpoint discrimination matters not, for it is the removal of an unpopular or controversial idea that offends the First Amendment.

## II.

A listener's reaction to speech is not a content-neutral basis for regulation. Forsyth County v. Nationalist Movement, 505 U.S. 123, 134 (1992) (citing Boos v. Barry, 485 U.S. 312, 321, 324 (1988)); Lewis, 253 F.3d at 1081. While the government can enact "content-neutral" restrictions based on the secondary effects the speech creates, an effect from speech is not secondary if it arises specifically from listeners' reactions to the speech. Lewis, 253 F.3d at 1081 (citing Boos, 485 U.S. at 321); see Robb, 370 F.3d at 743; see also Geoffrey R. Stone, Content Regulation and the First Amendment, 25 Wm. & Mary L. Rev. 189, 237-38 (1983).

In Lewis, the Missouri Department of Revenue (DOR) rejected Mary Lewis's application for a license plate with the letters "ARYAN-1." It argued that preventing this display was necessary to protect highway safety. We rejected the invitation to extend the secondary effects doctrine that far because the targeted "secondary effects" of preventing "road rage" and protecting highway safety arose specifically from

-12-

listeners' reactions to the license plates. Lewis, 253 F.3d at 1081. The court concluded "*[e]ven if we assume that the DOR made no judgment about the viewpoint of Ms. Lewis's speech* . . . we reject its attempt to censor Ms. Lewis's speech because of the potential responses of its recipients. The first amendment knows no heckler's veto." Id. at 1082 (emphasis added); accord Forsyth County, 505 U.S. at 134 (holding that a restriction justified by the "cost of maintaining public order" was content based, not a secondary effect, because it was "associated with the public's reaction to the speech").

## III.

When the officers arrived at the demonstration site the first time, they acknowledged that the demonstrators had a right to be where they were. Officer Woods testified that he saw no one standing in the roadway or holding signs over the street. After five to ten minutes, the officers left.

When the officers returned to the site, the only significant change was the presence and volume of the hecklers. Officer Woods still saw no one standing in or holding signs over the roadway.[3] He did see an argument between a demonstrator and a motorist. And the officers spoke with several complainants about the demonstration.[4] None of the complainants stated that appellants were holding signs over or standing on the roadway. Instead, the police report shows that the complainants were "distraught," "shocked," and "disgusted" by the signs. Captain

---

[3]The protestors deny that they or their signs were in the street. Because the officers moved for summary judgment, we must resolve this factual dispute in appellants' favor.

[4]Along with the drivers that the officers interviewed, two other people saw the appellants' signs and pulled over. One woman actually joined the demonstration by holding a sign, and the other expressed interest in doing so. Neither individual testified that the roadway was obstructed.

-13-

Tarwater then explained to the demonstrators that their signs "were offending people passing through the intersection creating a hazard to public safety." Appellants' App. at 79.

Sergeant William Wranich also testified about the scene. He observed that drivers were pulling over, not because of an impaired view, but because some of appellants' signs offended them. He also describes the order to remove the signs:

A.     They were given an option to remove the signs, but they could protest as long as they weren't using the *offensive* signs.

Q.     Do you recall any officer ordering that specific signs be confiscated?
. . .

A.     The order was that anyone holding the sign, refusing to give up the sign would be arrested.
. . .

Q.     Okay. And when you say they were given a chance to put down the sign, did that include all of the signs that were present that day?

A.     It was the *offensive signs, the ones that the traveling public had complained about that were offensive*.

Id. at 120-21 (emphasis added).

The other exhibits tell the same story. The record shows that Captain Tarwater told the demonstrators that "if they refused to put away the *disturbing, graphic photos*, they would be placed under arrest." And the tickets the officers issued charge that the appellants "[d]id unlawfully . . . obstruct a public street by hindering or impeding the free and uninterrupted passage of traffic, by *displaying graphic matter*

-14-

*causing a traffic hazard by causing drivers to become emotionally distraught and causing them to swerve and slam on their brakes."*

Although the officers argue in terms of their interests in protecting public safety and preventing traffic obstruction, these concerns arose directly from listeners' reactions. The protestors could remain if they removed certain signs. Which signs? According to the exhibits described above, public safety demanded that the protestors remove the *disturbing, graphic, shocking, offensive photos that the public had complained about.* This police action is content based just as would be a state statute directing that *"upon the complaint of any citizen that a demonstrator's photo is offensive and causes the citizen to become too emotional to operate a vehicle, the state shall order the demonstrator to move."* Both the police in this case and the state that enacted the hypothetical statute could proffer content-neutral, "secondary effect" justifications. But because the concerns in both cases arise directly from the listeners' reactions, the law deems them content based, not secondary effects. In other words, the law protecting against hecklers' vetoes places meaningful limits on the secondary effects doctrine. Here, the facts, when viewed in the light most favorable to the demonstrators, show the officers silenced the speaker for reasons that arose directly from the listeners' reaction.

Myriad cases forbid the government from silencing the speaker to protect against the listener's unlawful reaction. See, e.g., Coates, 402 U.S. at 614. A state cannot forbid the use of a license plate bearing a white-supremacy message based on the fear that passersby might become offended and experience road rage. Lewis, 253 F.3d at 1081. Nor does the interest in public safety allow a state to forbid the KKK from adopting a highway, even though passersby may become outraged when they realize the Klan sponsors the highway. See Robb, 370 F.3d at 743. A state cannot forbid pamphlet distribution because recipients may litter. Schneider v. Town of Irvington, 308 U.S. 147, 160 (1939). And the danger that some patriots may react

violently to a jacket that says "FUCK THE DRAFT" does not justify the state to seize the jacket from one who wears it in a courthouse. Cohen, 403 U.S. at 23.

In all of those situations, the speaker is protected, and the government must punish those who react lawlessly to a controversial message. Cf. Schneider, 308 U.S. at 162 ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers upon the streets."). If the KKK-sponsored billboard angers a driver and causes her to speed, the police must ticket the driver. If a motorist becomes outraged at a license plate that reads ARYAN-1, the law still charges the motorist with the duty to control his vehicle. If a veteran punches Mr. Cohen for wearing his jacket, the police must arrest the veteran for assault.

I don't understand why, in this case, we target the speaker instead of the listener who fails to control his vehicle. We ticket a litterer, not the pamphleteer. But we ticket the pro-life sign holder, not the one who obstructs traffic by stopping erratically to protest the protestors. (I wonder if the Kansas City police would ticket, for littering, a pro-life pamphleteer whose "offensive" pamphlet caused a shocked recipient to drop it.) Missouri motorists must control themselves when a KKK road sign offends them, but apparently not when confronted with "offensive" pro-life messages. The person who rear ends the car bearing an ARYAN-1 license plate is responsible for the accident, but in this case the police informed the sign holders that they could be held responsible for accidents caused by their controversial signs. The First Amendment does not allow such distinctions. Today, the court creates a content-based jurisprudence in abortion cases.

"A police officer has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas. Instead, he must take reasonable action to protect" persons exercising their constitutional rights. Glasson v. Louisville, 518 F.2d 899, 906 (6th Cir. 1975) (citing Sellers v. Johnson, 163 F.2d

-16-

877 (8th Cir. 1947)). I would deny the officers' motion for qualified immunity because no reasonable officer could have concluded (before reading the court's opinion today) that he could arrest a demonstrator because the offensiveness of a sign caused other citizens to become so emotional that they lost the ability to focus on the road and control their vehicles therefore "obstructing traffic."

## IV.

The court errs in three ways. First, this is not a captive-audience case. Second, a content-based distinction cannot be a "manner" restriction under the time, place, and manner test. And third, the secondary effects doctrine doesn't apply here.

First, because this is not a captive-audience case, the court errs when it relies upon <u>Hill</u> to distinguish <u>Cohen</u>. In most situations, the government cannot silence speech to protect the listener from offensive messages. <u>Cohen</u>, 403 U.S. at 21. The ability to silence is limited to situations in which the listener can show that he is a member of a captive audience; that is, his "substantial privacy interests are being invaded in an essentially intolerable manner." <u>Id.</u> In <u>Hill</u>, the Court merely noted that the "recognizable privacy interest in avoiding unwanted communication varies widely in different settings." <u>Hill v. Colorado</u>, 530 U.S. 703, 716 (2000). Today, the court notes the existence of a busy intersection and the presence of large signs and moves on. I have no idea how these two factors affect the substantial-privacy-interest showing necessary to silence a speaker.

The captive-audience exception applies "where the degree of captivity makes it impractical for the unwilling viewer . . . to avoid exposure." <u>Id.</u> at 718 (quotations omitted); <u>Redrup v. New York</u>, 386 U.S. 767, 769 (1967). In <u>Hill</u>, the ordinance restricted no message. It restricted no signs. It silenced no speaker. The law had no impact on what a protestor could say or write on a sign while standing on the sidewalk. It prohibited *approaching* a patron to within eight feet of the patron's body.

-17-

By doing so it protected both the speaker's and the listener's interests: the speaker could still speak, but the approach restriction *allowed* the patron to avert her eyes. In this case, we had a stationary protest, in a public forum, where the willing drivers could join the protest (as one did) and the unwilling audience could simply look away. These sidewalk demonstrators held no passing drivers captive, so the drivers should have looked away and driven on instead of looking to the government to silence the demonstrators. Cohen, 403 U.S. at 21.

Second, the court's adroitly phrased time-place-and-manner discussion cannot hide the heckler's veto. The court notes that "the police officers placed reasonable restrictions on the location of the signs." Ante at 7. Which signs? The complete sentence would read, "the police officers placed reasonable restrictions on the location of the signs *that the passersby described as offensive and disgusting*." Such selective restrictions are not content-neutral manner restrictions.

Nor can the court justify the restriction as having only a secondary or "incidental" effect on expression. Id. We already rejected that approach in Lewis. Here, the "traffic obstruction" arose specifically from the passersby's reactions. So "even if we assume that [the officers] made no judgment about the viewpoint of [the demonstrators'] speech," we must reject the attempt to censor the speech based on the response of the passersby. Lewis, 253 F.3d at 1082.

## V.

If signs create a visual distraction, a city can regulate, within limits, how close protestors can stand to the street. It can limit the size of signs. But it can't choose which messages demonstrators can display near the street. It can't limit which messages demonstrators can place on large signs. And police officers certainly cannot let citizens determine, under an offensiveness criteria, which demonstrators can protest where or through which means. Otherwise, the government "would

-18-

effectively empower a majority to silence dissidents simply as a matter of personal predilections." <u>Cohen</u>, 403 U.S. at 21; <u>see</u> Appellants' App. (Wranich Deposition) at 121 ("[T]hey could  protest as long as they weren't using the *offensive* signs."  We ordered them to remove "the offensive signs, the ones that the traveling public had complained about that were offensive.") (emphasis added); Appellants' App. at 113 (We told them we would arrest them "if they refused to put away the disturbing, graphic photos.").

The First Amendment knew no heckler's veto, before today.  I respectfully dissent.

_____